STATE OF NORTH CAROLINA v. JEFFREY P. DICKENS

No. 189A96

(Filed 9 May 1997)

1. **Evidence and Witnesses § 1220 (NCI4th)— first-degree murder—defendant's statement to officers—probable cause to arrest—statement admissible**

     · The trial court did not err by not suppressing a first-degree murder defendant's statements in their entirety for lack of probable cause for his arrest and interrogation where the evidence indicated that Woods told a Special Agent when arrested that he had an accomplice; his earlier questions to the Sanford Police Department during a 911 call about what would happen to an accomplice intimated the same and the officers therefore knew that Woods had not acted alone; their suspicions were confirmed when a witness informed an officer that Woods had told her that he and defendant had broken into the victim's home and that defendant had killed the victim; that information was relayed to other investigating officers, who had examined the body at the scene and determined that the victim had been beaten to death with a blunt object; and a detective saw a hammer in defendant's truck that he thought could have been the murder weapon. The officers had probable cause to believe defendant had participated in the murder and burglary and therefore to place him under arrest.

     **Am Jur 2d, Evidence § 752.**

2. **Evidence and Witnesses § 1224 (NCI4th)— confession— delay of four hours in appearance before a magistrate— confession admissible**

     The trial court did not err by not suppressing a first-degree murder defendant's statement where he was arrested at 9:50 p.m. and interrogated from 11:00 p.m. until 12:30 a.m.; warrants for his arrest were served between 1:30 and 2:00 a.m.; he was brought before a magistrate at 2:00 a.m.; and defendant contended that his statement should have been suppressed in its entirety because of the delay in taking him before a magistrate. The delay was four hours; a delay of four and one-half hours has been found not unreasonable or prejudicial. More importantly, defendant has failed to show that he would not have made an inculpatory statement absent the delay.

**Am Jur 2d, Evidence §§ 732, 734.**

**Admissibility of confession or other statement made by defendant as affected by delay in arraignment—modern state cases. 28 ALR4th 1121.**

**Construction and application of provision of Omnibus Crime Control and Safe Streets Act of 1968, as amended (18 USCS sec. 3501(c)), that defendant's confession shall not be inadmissible in evidence in federal criminal prosecution solely because of delay in presentment before magistrate. 124 ALR Fed. 263.**

3. **Searches and Seizures § 87 (NCI4th)— search warrant—blood samples from defendant—probable cause**

The trial court did not err in a first-degree murder prosecution by failing to suppress blood samples drawn from defendant pursuant to a search warrant where defendant argued that there was no forecast of evidence that defendant's blood either constituted evidence of murder or would assist in identifying the perpetrator, but the affidavit signed by an agent to support the issuance of the warrant contained ample data to support the warrant and the cumulative effect of the information establishes that the blood samples seized from defendant provide evidence of the offense and the identity of the person participating in the crime.

**Am Jur 2d, Searches and Seizures §§ 118, 119, 123, 125.**

4. **Homicide § 374 (NCI4th)— first-degree murder—sufficiency of evidence—acting in concert**

The trial court did not err by instructing the jury in a first-degree murder prosecution that it could convict defendant on the basis of malice, premeditation, and deliberation under the theory of acting in concert where the evidence indicated that an accomplice, Woods, initially told defendant a story about being able to break into the victim's trailer without being caught; defendant suggested that they break in and steal something; they drove to the victim's trailer together, pried open window panes to the back door, and entered; and, when the victim discovered them, Woods grabbed her hands and forced her into the bedroom, whereupon defendant delivered the fatal blows. This evidence sufficiently indicates that the two men were acting together pursuant to a common plan.

**Am Jur 2d, Homicide § 445.**

**5. Criminal Law § 473 (NCI4th Rev.)— first-degree murder— prosecutor's argument—comment on legal maneuvering**

The trial court did not err during a first-degree murder prosecution by overruling defendant's objection to the prosecutor's argument that prosecutors don't normally enter into plea agreements "until all of the defense legal maneuvering is over" where the State had entered into a plea agreement with an accomplice by which he received two life sentences in exchange for his truthful testimony, defense counsel suggested during closing arguments that the accomplice's testimony was tainted because of the plea agreement, and the State argued in response that the defense lawyers had suggested that there was something amiss because the State waited until the eve of trial to enter into this agreement. The prosecutor was merely informing the jury that the timing of the plea agreement was normal and did not affect the veracity of Woods' testimony; there was no suggestion that defense counsel was lying to the jury or of an intention to disparage counsel's credibility.

**Am Jur 2d, Trial §§ 497, 499, 566, 683, 684.**

**Propriety and effect of attack on opposing counsel during trial of a criminal case. 99 ALR2d 508.**

**6. Jury § 35 (NCI4th)— first-degree murder—supplemental list of jurors three days before trial—no error**

The trial court did not err during jury selection in a first-degree murder prosecution where a supplemental list of jurors was prepared three days before trial and defendant's motion that these jurors be discharged because N.C.G.S. § 9-5 requires that prospective jurors be selected for service at least thirty days prior to the session was denied. It is true that N.C.G.S. § 9-5 mandates that jurors be selected at least thirty days in advance of the scheduled session, but N.C.G.S. § 9-11 specifically allows a trial court to summon a special venire of jurors at any time and the thirty-day notice provision in N.C.G.S. § 9-5 therefore did not apply to the trial court's selection of a supplemental jury panel.

**Am Jur 2d, Jury §§ 126-130.**

7. **Jury § 99 (NCI4th)— first-degree murder—jury selection—excusal of accepted juror—no additional peremptory challenge**

The trial court did not err in a first-degree murder prosecution by failing to award defendant an additional peremptory challenge following the reexamination and excusal for cause of one of the supplemental jurors where the juror was initially passed by both sides before further examination revealed reasons supporting removal for cause. N.C.G.S. § 15A-1214(g) allows the trial court for good cause to examine and excuse a juror already accepted and provides that any replacement juror is subject to examination and challenge, but does not afford additional peremptory challenges. Indeed, the trial court is precluded from authorizing any party to exercise more peremptory challenges than specified by statute.

**Am Jur 2d, Jury §§ 234, 235, 238-240.**

8. **Jury §§ 203, 206, 215 (NCI4th)— first-degree murder—jurors not excused for cause—having read newspaper accounts—related to state troopers—belief in capital punishment**

The trial court did not abuse its discretion in a first-degree murder prosecution by failing to excuse two jurors for cause where the first admitted to reading about defendant's case in the newspaper, specifically noting the information concerning jury selection because she had been summoned for jury service, the court further discovered that this juror's son was a state trooper and her husband a retired state trooper, and the second juror was challenged based on her unequivocal statement that she believed in the death penalty and favored it as a punishment for first-degree murder. The record reveals that the first juror demonstrated a conscientious resolve to be fair and impartial and indicated that she had formed no opinion about defendant's guilt or innocence, and, while the second juror believed in the death penalty, she clearly stated that she could impose life imprisonment as punishment for first-degree murder and that she could follow the law with respect to the capital sentencing procedure.

**Am Jur 2d, Jury §§ 266, 267, 279, 289, 304.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

9. **Searches and Seizures § 114 (NCI4th)— first-degree murder—search warrant—tires seized from defendant's vehicle—affidavit sufficient**

The trial court did not err in a first-degree murder prosecution by not suppressing tires seized from defendant's vehicle where defendant argued that the warrant application lacked sufficient information to support probable cause for issuance of a search warrant. The affidavit accompanying the warrant application avers that police officers found tire tracks in the sand about twenty-five yards below the victim's trailer; plaster impressions of the tracks were taken; and an accomplice indicated that he and defendant drove to the victim's trailer in defendant's truck and parked the truck below the trailer on a sand driveway. These facts and circumstances create a reasonable ground to believe that the proposed search would reveal the presence of the objects sought and that those objects would aid in the apprehension or conviction of the offender.

**Am Jur 2d, Searches and Seizures §§ 118-121, 123, 125.**

**Propriety of considering hearsay or other incompetent evidence in establishing probable cause for issuance of search warrant. 10 ALR3d 359.**

10. **Evidence and Witnesses §§ 1700, 1704 (NCI4th)— first-degree murder—photographs of body at scene—autopsy photographs—admissible**

The trial court did not abuse its discretion in a first-degree murder prosecution by permitting the State to introduce five autopsy photographs as well as six photographs of the body as found at the crime scene. The autopsy photographs were used to illustrate the testimony of the medical examiner and demonstrated with clarity the nature and placement of the wounds and supported the State's theory that the cause of the victim's death was repeated blows to the head with a blunt weapon. The crime scene photographs were introduced to illustrate the testimony of officers with respect to the crime scene and the position of the body.

**Am Jur 2d, Evidence §§ 960-965.**

**Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.**

11. **Evidence and Witnesses § 1209 (NCI4th)— first-degree murder—gestures and comments by defendant in jail— admissible**

The trial court did not abuse its discretion in a first-degree murder prosecution by permitting a State's witness to testify about gestures and comments defendant made in jail where defendant contended that the testimony was unfairly prejudicial and of no probative value. Defendant's anger toward his visitor and threats to his accomplice constituted self-incriminating actions probative of defendant's awareness of his guilt.

**Am Jur 2d, Evidence §§ 327, 328, 333, 763.**

12. **Evidence and Witnesses § 2811 (NCI4th)— first-degree murder—defendant's girlfriend—State permitted to lead— no abuse of discretion**

The trial court did not abuse its discretion in a first-degree murder prosecution by permitting the prosecutor to lead a State's witness where the witness had been defendant's girlfriend for five years, did not wish to testify against him and was evasive in response to questions from the State, and the State informed the court that the witness was not cooperating and had refused to talk with prosecutors the day before she was to take the witness stand.

**Am Jur 2d, Witnesses § 754.**

13. **Criminal Law § 1242 (NCI4th Rev.)— first-degree bur- glary—sentencing—nonstatutory mitigating factors—not found—no abuse of discretion**

The trial court did not abuse its discretion by sentencing defendant to life imprisonment for first-degree burglary where the presumptive sentence is only fifteen years and defendant had requested that the court find nonstatutory mitigating factors regarding defendant's age, his support system in the community, and his positive employment history. The evidence in support of defendant's proposed nonstatutory mitigating factors all came from interested witnesses and substantially supported the statu- tory mitigator that defendant was a person of good character or had a good reputation in the community, which the court found. Defendant was sentenced under the Fair Sentencing Act, so that the Structured Sentencing Act and its statutory mitigating factors had no relevance.

**Am Jur 2d, Criminal Law §§ 598, 599.**

STATE v. DICKENS

[346 N.C. 26 (1997)]

**14. Evidence and Witnesses § 2047 (NCI4th)— first-degree murder—demeanor of witness during interview—testimony of detective—admissible**

The trial court did not err in a first-degree murder prosecution by allowing a detective to testify about the demeanor of a State's witness, who was also defendant's girlfriend, during interviews with law enforcement officers where he testified that she was uncooperative and reluctant to answer questions the first time he talked with her and more open the second. N.C.G.S. § 8C-1, Rule 701 permits a lay witness to testify as to opinions or inferences which are rationally based on that witness's perceptions and are helpful to a clear understanding of the testimony or a determination of a fact in issue.

**Am Jur 2d, Expert and Opinion Evidence §§ 26, 29-31, 53, 54.**

**15. Evidence and Witnesses § 887 (NCI4th)— first-degree murder—tape of 911 call—proof that call made—not hearsay**

The trial court did not err in a first-degree murder prosecution by admitting a tape recording and transcript of a 911 call in which an accomplice called the Sanford Police Department and asked hypothetically "if two guys broke in a place, and one guy killed somebody right in there, how much time would that guy get that didn't do the killing?" The tape and transcript were not offered to prove the truth of the matter asserted, but that the 911 call was made.

**Am Jur 2d, Evidence §§ 664, 665.**

**16. Evidence and Witnesses § 3027 (NCI4th)— first-degree murder—accomplice's prior violent conduct—excluded**

The trial court did not err in a first-degree murder prosecution by excluding evidence of an accomplice's prior violent conduct based on N.C.G.S. § 8C-1, Rule 608 (b), which bars introduction of evidence of specific instances of conduct to attack or support the credibility of a witness, with a limited exception for evidence clearly probative of truthfulness or untruthfulness. Although defendant contends that the evidence was offered to show that it was the accomplice who actually inflicted the fatal blows, the conduct must be sufficiently similar to support a reasonable inference that the same person committed both the ear-

lier and the later acts and there is here no commonality between the proffered evidence and the events surrounding this murder.

**Am Jur 2d, Witnesses §§ 901-904.**

**17. Evidence and Witnesses § 119 (NCI4th)— first-degree murder—accomplice's prior misconduct—properly excluded**

The trial court did not err in a first-degree murder prosecution by excluding evidence of an accomplice's prior violent conduct where the alleged misconduct indicates only that the accomplice had in the past displayed aggression toward other men upon being provoked, not that he mercilessly beat to death an eighty-nine-year-old woman, and in no way exculpates defendant or provides any inconsistency with his guilt. It appears that defendant attempted to introduce the evidence to show conformity with past violent acts, the only purpose specifically prohibited by N.C.G.S. § 8C-1, Rule 404(b).

**Am Jur 2d, Evidence § 587.**

**Admissibility of evidence of commission of similar crime by one other than accused. 22 ALR5th 1.**

**18. Evidence and Witnesses § 2750.1 (NCI4th)— first-degree murder—accomplice's prior violent acts—door not opened**

The State did not open the door to evidence of an accomplice's prior violent conduct where a witness testified that she believed the accomplice when the accomplice said that defendant killed the victim, when the accomplice read to the jury a letter he had written to the victim's grandson in which he said he could not have done it, or when the State asked the accomplice if he had ever been convicted of any crimes. The statement of the witness does not raise the issue of the accomplice's prior violent conduct or reflect in any way upon the likelihood that the accomplice rather than defendant committed the murder, the statement in the letter referred not to the physical inability of the accomplice to kill the victim but to emotional ties to the victim and her family, and defendant may not avail himself of N.C.G.S. § 8C-1, Rule 609(a) because he sought to introduce instances of conduct rather than convictions.

**Am Jur 2d, Evidence §§ 404, 408, 412-414, 417, 418, 421.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Bowen, J., at the 1 May 1995 Criminal Session of Superior Court, Harnett County, upon a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional judgment of imprisonment entered upon his conviction for first-degree burglary was allowed 30 April 1996. Heard in the Supreme Court 12 November 1996.

*Michael F. Easley, Attorney General, by David F. Hoke, Assistant Attorney General, for the State.*

*Staton, Perkinson, Doster, Post, Silverman & Adcock, by Norman C. Post, Jr., and Jonathan Silverman, for defendant-appellant.*

WHICHARD, Justice.

Defendant was tried capitally for the first-degree murder of eighty-nine-year-old Roseline Murphy. He was also tried for the first-degree burglary of Murphy. The jury found him guilty of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule and recommended a sentence of life imprisonment. The trial court accordingly sentenced defendant to life imprisonment on the first-degree murder conviction and to life imprisonment for the first-degree burglary conviction, to run consecutive to the sentence for murder.

The State presented evidence that on the evening of 30 October 1993, after drinking beer and smoking marijuana, defendant and his friend David Woods went to a party. While at the party, Woods told defendant he had smoked crack cocaine with Gibbs Davenport behind Roseline Murphy's trailer three days before. Woods had dared Davenport to go into the trailer and bragged that he could go in without being caught; however, neither Davenport nor Woods went in the trailer at that time. After hearing the story, defendant suggested to Woods that they break into Roseline Murphy's trailer and steal something. Defendant and Woods left the party and drove to Murphy's trailer. Defendant had a hammer in his truck which he used to pry open the window panes of the back door of the trailer. As soon as they were inside, however, Murphy came out of her bedroom, apparently recognized Woods, and said, "Get out. Why are you here? Get out." Woods grabbed her hands and forced her back into the bedroom. Murphy told Woods she knew who he was, whereupon he told

her he was leaving. Defendant then walked into the bedroom and hit Murphy with the hammer. As Woods fled the trailer, he heard several thuds and gurgling noises coming from the bedroom. Defendant emerged from the trailer a short time later, and he and Woods left the premises. Defendant and Woods then drove to a known "crack house" and purchased crack cocaine.

The following day Woods told several people that he had "messed up" and that defendant had murdered Murphy after breaking into her home. Later, Woods placed a 911 call to the Sanford Police Department and asked, hypothetically, "If these two guys broke in a place, and one guy killed somebody right in there, how much time would that guy get that didn't do the killing?" The police traced the call to the home of Susan Davis. When they arrived at the Davis residence, Susan Davis told them Woods had used her phone. The police proceeded to Woods' trailer and placed him under arrest.

Marie Wilder was present when Woods was arrested. She told the police officers that defendant was the one who had committed the murder and that he was staying in Amy Smith's trailer. The officers went to Smith's trailer, found defendant, and placed him under arrest as well. Defendant's truck was impounded, and a hammer was seized from a tool belt found on the front seat.

Defendant waived his rights and gave a statement to Special Agent Paul Munson and Detective Jerry Lamm. Defendant initially stated that after the party he went straight to his girlfriend's house and fell asleep. Detective Lamm asked him if he remembered going to Murphy's trailer. Defendant replied "no" and then stated that he did not wish to answer any more questions. At this point Special Agent Mike East entered the room and told defendant that Woods was making a statement and that Agent East knew what had happened. Defendant stated that he wanted to talk to a lawyer. Agent East and Detective Lamm left the room. As Agent Munson was lifting his notebook and jacket from the floor, defendant asked if he could have water and time to think. Agent Munson gave defendant some water and left him alone for approximately five minutes. When Agent Munson reentered the room, he asked defendant if he wanted to talk about what happened. Defendant replied, "I didn't mean to kill her," and then gave a detailed confession to the murder and burglary.

Defendant filed a pretrial motion to suppress all statements he made to law enforcement officers. The trial court allowed the motion with respect to statements defendant made after invoking his Fifth

Amendment right to counsel. The statement defendant made prior to invocation of his rights was admitted.

[1] By his first assignment of error, defendant argues that his statements should have been suppressed in their entirety because there was no probable cause for his arrest and the ensuing interrogation. Defendant contends that the trial court's findings of fact establishing that probable cause for arrest existed at the time law enforcement officers took him into custody are not supported by competent evidence. At best the evidence demonstrated that officers responded to a 911 call placed from Susan Davis' trailer in which the caller asked questions about the potential consequences of being present when someone else committed a murder. Defendant's name was not mentioned; and Woods, the caller, did not mention it when he was subsequently arrested. Woods stated only that he had an accomplice. Defendant contends that prior to his arrest, police found no evidence at the scene linking defendant to the crimes. He further contends that Sergeant Larry Munson testified that he did not recall having any specific information that defendant had been involved in a crime when he went to Smith's trailer looking for defendant. Defendant argues that because he was seized without probable cause in violation of his constitutional rights, the entire statement resulting from his seizure must be suppressed. We disagree.

An officer may make an arrest for a felony that was committed out of the officer's presence when the officer has probable cause to believe the person has committed the felony. N.C.G.S. § 15A-401(b)(2) (1988). Probable cause exists when the information known to the officer is " 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " *State v. Bright*, 301 N.C. 243, 255, 271 S.E.2d 368, 376 (1980) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 13 L. Ed. 2d 142, 145 (1964)). Here, the evidence indicates that when Woods was arrested, he told Agent East he had an accomplice. His earlier questions to the Sanford Police Department during his 911 call intimated the same. The officers therefore knew that Woods had not acted alone. Their suspicions were confirmed when Wilder informed Sergeant Munson that Woods told her he and defendant had broken into Murphy's home and defendant had killed Murphy. Sergeant Munson relayed this information to the other investigating officers, including Detective Lamm, who had examined Murphy's body at the scene and determined that she had been beaten to death with a blunt object. While outside the Smith residence, Detective Lamm saw in the front seat of defendant's

truck a hammer which he thought could have been the murder weapon. From these circumstances, the officers had probable cause to believe defendant had participated in the murder and burglary and therefore to place him under arrest.

When findings of fact are supported by competent evidence, they are conclusive on appeal. *State v. McRae*, 276 N.C. 308, 314, 172 S.E.2d 37, 41 (1970). Here, there was extensive evidence to support the findings, which in turn support the conclusion of law that there was probable cause to arrest defendant. Accordingly, the findings and conclusion are binding on this Court.

[2] Defendant further contends that his statement should have been suppressed in its entirety because of delay in taking him before a magistrate. Defendant was arrested at 9:50 p.m. and interrogated from 11:00 p.m. until 12:30 a.m. Warrants for his arrest were served between 1:30 and 2:00 a.m., and he was finally brought before a magistrate at 2:00 a.m. Defendant asserts that this four-hour interval between arrest and appearance violated the requirement that an officer take an arrested person before a magistrate without unnecessary delay. N.C.G.S. § 15A-511(a) (1988). We disagree.

Section 15A-511 does not prescribe mandatory procedures affecting the validity of a trial. *State v. Martin*, 315 N.C. 667, 679, 340 S.E.2d 326, 333 (1986). For a violation of section 15A-511 to be substantial, defendant must show that the delay prejudiced him in some way, for example, by resulting in a confession that would not have been obtained but for the delay. *Id.*; *State v. Hunter*, 305 N.C. 106, 113, 286 S.E.2d 535, 539-40 (1982). The delay here was four hours; this Court has previously declined to find a four and one-half hour delay inherently unreasonable or prejudicial. *State v. Richardson*, 295 N.C. 309, 323-24, 245 S.E.2d 754, 763-64 (1978). More importantly, defendant has failed to show that he would not have made an inculpatory statement absent the delay. This assignment of error is overruled.

[3] By his next assignment, defendant argues that the trial court erred in failing to suppress blood samples drawn from him pursuant to a search warrant authorizing the State to seize head hairs, pubic hairs, saliva, and blood samples. The invasion of a person's body to withdraw blood is the most intrusive type of search, and a warrant authorizing the seizure of blood must be based upon probable cause to believe the blood constitutes evidence of an offense or the identity of a person who participated in the crime. *State v. Carter*, 322 N.C. 709, 722-23, 370 S.E.2d 553, 561 (1988); *see* N.C.G.S. § 15A-242(4)

(1988). Defendant argues that it is clear from the face of the warrant that there was no forecast of evidence that defendant's blood either constituted evidence of the murder or would assist in identifying the perpetrator(s). Although the warrant application stated that the items seized would be used in comparative analysis with serological evidence obtained from the autopsy of Murphy and from the articles of defendant's clothing collected by Detective Lamm, the application did not contain any physical findings suggesting sexual assault or a description of the serological evidence obtained from Murphy or any indication that there was blood found on defendant's clothing. Defendant therefore contends that no probable cause existed for issuance of the warrant.

The affidavit signed by Agent East contained ample evidence to support issuance of the warrant, *inter alia*: (1) an account of the murder; (2) Woods' statement wherein he recounted hearing defendant strike Murphy several times and indicated that he was unsure whether defendant sexually assaulted her; (3) defendant's counter assertion that he did not actually see Woods sexually assault Murphy, although she was on the floor and the mattress was partially off the bed when defendant entered the bedroom; (4) Woods' description of the clothes defendant was wearing at the time of the murder; (5) confirmation that defendant's clothes were submitted to the SBI serology laboratory; (6) Special Agent Bodee's advice concerning the advantages of obtaining a DNA profile from a suspect; and (7) defendant's admission that he struck Murphy in the head with a hammer multiple times. The cumulative effect of this information establishes that the blood samples seized from defendant provide evidence of the offense and the identity of the person participating in the crime. Accordingly, probable cause existed to support issuance of the search warrant. This assignment of error is overruled.

[4] Defendant next argues that the trial court erred in instructing the jury that it could convict defendant of first-degree murder on the basis of malice, premeditation, and deliberation under the theory of acting in concert. Defendant was found guilty of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule, in addition to being convicted of and sentenced for first-degree burglary. According to defendant, the evidence showed either that he personally killed Murphy or that he was not a participant in any crime; it did not support a charge that he and Woods acted with a common purpose and scheme to kill Murphy. Defendant asserts that because the trial court erroneously instructed

on acting in concert, the only fair interpretation of the verdicts is that defendant was convicted of first-degree murder under the felony murder rule on the theory that he acted in concert with Woods, who killed Murphy during the commission of a burglary. Because defendant lacked the specific intent to kill Murphy, the guilty verdict based on malice, premeditation, and deliberation must necessarily fail. With only felony murder remaining as the basis for the conviction of first-degree murder, defendant argues that the first-degree burglary conviction merges with the murder conviction and that judgment must be arrested on the burglary charge.

The trial court instructed the jury on acting in concert as follows:

For a person to be guilty of a crime, it is not necessary that he personally do all the acts necessary to constitute that crime. If two or more persons with a common purpose act together to commit the crime, every person with the specific intent to commit the crime is responsible for the acts of the other participants.

So members of the jury, I charge that if you find from the evidence beyond a reasonable doubt that on or about the alleged date the defendant either by himself or acting together with David Woods intentionally killed the victim with a deadly weapon and that this proximately caused the victim's death, and that the defendant intended to kill the victim, and that he acted with malice, and with premeditation and deliberation, your duty would be to return a verdict of guilty of first-degree murder on the basis of malice, premeditation and deliberation.

This instruction is substantially similar to the pattern instruction on acting in concert, N.C.P.I.—Crim. 202.10 (1994), and to the instruction held proper in *State v. McCarver*, 341 N.C. 364, 386-87, 462 S.E.2d 25, 37-38 (1995), *cert. denied,* — U.S. —, 134 L. Ed. 2d 482 (1996). Likewise, under these facts it was proper for the trial court to give the instruction. The evidence indicates that Woods initially told defendant a story about being able to break into Murphy's trailer without being caught. After hearing the story, defendant suggested to Woods that they break into the trailer and steal something. Together they drove to Murphy's trailer, pried open the window panes to the back door, and entered. When Murphy discovered them, Woods grabbed her hands and forced her into the bedroom, whereupon defendant delivered the fatal blows. This evidence sufficiently indicates that the two men were acting together pursuant to a common plan. *See State v. Joyner*, 297 N.C. 349, 358, 255 S.E.2d 390, 395

(1979). Defendant was therefore properly convicted of first-degree murder on the basis of malice, premeditation, and deliberation; the first-degree burglary conviction thus need not merge with the conviction for first-degree murder.

[5] By a further assignment, defendant contends the trial court erred in allowing the prosecutor to make improper and prejudicial statements to the jury during closing argument. On the eve of trial, the State entered a plea agreement with Woods. In exchange for a promise of his truthful testimony concerning the murder, Woods received two consecutive class C life sentences. During closing argument, defense counsel suggested that the testimony of Woods was tainted because of this plea agreement and urged the jurors to consider the testimony with skepticism because Woods possibly saved his own life by testifying against defendant. The prosecutor, in response, argued:

> The defense lawyers suggest to you that there's something amiss, perhaps even sinister or underhanded, because the State waits until the eve of trial to enter into this agreement with [Woods]. Well, don't be deceived by that. His lawyers know full well that prosecutors typically don't enter into such agreements . . . until all of the defense legal maneuvering is over.

Defense counsel objected, but the trial court overruled the objection. Defendant now argues that the clear import was that defense counsel was not being truthful in commenting on the significance and timing of Woods' plea agreement. Because the remarks were plainly intended to prejudice the jury against defendant and his counsel, the trial court should have sustained defendant's objections. After careful review of the record, we conclude that the prosecutor was merely informing the jury that the timing of the plea agreement was normal and did not affect the veracity of Woods' testimony. There was no suggestion that defense counsel was lying to the jury or of an intention to disparage counsel's credibility. This assignment of error is overruled.

[6] Defendant's next assignment of error contains three parts. Defendant first contends the trial court committed reversible error during jury selection because the panel of jurors selected for the jury venire was not drawn in accordance with N.C.G.S. § 9-5, which requires prospective jurors to be selected for service at least thirty days prior to the session. Here, three days before trial, a supplemental list of jurors was prepared. Defendant moved that these

jurors be discharged, but the trial court denied the motion. Seven from the supplemental list were ultimately called to the jury box. The State and defendant excused two and three of these prospective jurors respectively, and two were excused for cause. Thus, while no supplemental juror was selected, defendant nevertheless argues that their presence on the eve of trial created tactical difficulty for the defense. Defendant therefore urges this Court to determine that failure to comply with N.C.G.S. § 9-5 is a substantial breach of due process in that it denies an accused the opportunity to study in advance those who will sit in judgment of him. We decline to do so.

It is true that section 9-5 mandates that jurors be selected at least thirty days in advance of the scheduled session. N.C.G.S. § 9-5 (1988). However, N.C.G.S. § 9-11 specifically allows a trial court to summon a special venire of jurors at any time. N.C.G.S. § 9-11 (1986). "The language of G.S. 9-11 is clear and unambiguous, and its provisions authorize the trial judge to order the summonsing of supplemental jurors in order to insure orderly, uninterrupted, and speedy trials." *State v. Fountain*, 282 N.C. 58, 64, 191 S.E.2d 674, 679 (1972). The thirty-day notice provision in section 9-5 therefore did not apply to the trial court's selection of a supplemental jury panel.

[7] Defendant next argues that the trial court erred in failing to award him an additional peremptory challenge following the reexamination and excusal for cause of one of the supplemental jurors. Juror Peggy Hubbard was initially passed by both sides before further examination revealed reasons supporting removal for cause. After Hubbard was excused, defendant moved for an additional peremptory challenge, which the trial court denied. Defendant now argues that N.C.G.S. § 15A-1214 requires the trial court to grant an additional peremptory challenge after a juror previously accepted is removed for cause. This section allows the trial court, for good cause, to examine and excuse a juror already accepted by a party. N.C.G.S. § 15A-1214(g) (1988). The statute further provides that "[a]ny replacement juror called is subject to examination, challenge for cause, and peremptory challenge as any other unaccepted juror." *Id.* The statute does not, however, afford additional peremptory challenges. Indeed, the trial court is precluded from authorizing any party to exercise more peremptory challenges than specified by statute. *State v. Johnson*, 298 N.C. 355, 363, 259 S.E.2d 752, 758 (1979). The trial court therefore properly denied defendant's motion.

**[8]** Finally, defendant contends the trial court erred in failing to excuse jurors Sinclair and West for cause. During *voir dire* Sinclair admitted to reading about defendant's case in the *Dunn Daily Record.* She specifically noted the information concerning jury selection for the case because she had been summoned for jury service. The trial court further discovered that Sinclair's son was a state trooper and that her husband was a retired state trooper. Based on this information, defendant asserts that Sinclair could not be fair and impartial and therefore should have been removed for cause. Defendant's challenge for cause of West was based on her beliefs concerning the death penalty. West stated unequivocally that she believed in the death penalty and favored it as a punishment for first-degree murder.

The trial court has the opportunity to see and hear a juror and has the discretion, based on its observations and sound judgment, to determine whether a juror can be fair and impartial. *State v. Yelverton,* 334 N.C. 532, 543, 434 S.E.2d 183, 189 (1993). The record reveals that Sinclair demonstrated a conscientious resolve to be fair and impartial and indicated that she had formed no opinion about defendant's guilt or innocence based on what she had read. The trial court's decision was based on answers given by Sinclair, and defendant has failed to show any abuse of discretion in the denial of his challenge for cause of this juror.

The trial court also properly denied defendant's challenge for cause of West. While West believed in the death penalty, she clearly stated that she could impose life imprisonment as punishment for first-degree murder and that she could follow the law with respect to the capital sentencing procedure. This assignment of error is overruled.

**[9]** By his next assignment, defendant contends the trial court erred by failing to suppress the tires seized from defendant's vehicle. He argues that the warrant application lacked sufficient information to support a finding of probable cause for the issuance of a warrant to search his vehicle and seize his tires.

The affidavit accompanying the warrant application avers that police officers found tire tracks in the sand approximately twenty-five yards below Murphy's trailer. Plaster impressions of the tracks were taken and sent to the SBI crime laboratory. The affidavit further reports that in his confession Woods indicated that he and defendant drove to Murphy's trailer in defendant's truck and parked the truck

below the trailer on a sand driveway. These facts and circumstances create a reasonable ground to believe that the proposed search would reveal the presence of the objects sought and that those objects would aid in the apprehension or conviction of the offender. *State v. McKinnon*, 306 N.C. 288, 292, 293 S.E.2d 118, 121 (1982). We therefore hold that the search warrant was duly issued and the evidence properly admitted. This assignment of error is overruled.

[10] Defendant next argues that the trial court erred by permitting the State to introduce five autopsy photographs as well as six photographs of Murphy's body as it was found at the crime scene. Defendant contends these photographs should have been excluded because they were inflammatory and duplicative and their probative value was greatly outweighed by the danger of unfair prejudice. N.C.G.S. § 8C-1, Rule 403 (1992). We disagree.

What represents "an excessive number of photographs" and whether the "photographic evidence is more probative than prejudicial" are matters within the trial court's sound discretion. *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). Photographs of the victim depicting injuries to the body and the manner of death may be used to illustrate the witness' testimony to this effect. *State v. Daughtry*, 340 N.C. 488, 518, 459 S.E.2d 747, 762 (1995), *cert. denied*, — U.S. —, 133 L. Ed. 2d 739 (1996). Likewise, photographs "showing the condition of the body when found, its location when found, and the surrounding scene at the time . . . are not rendered incompetent by the portrayal of the gruesome events which the witness testifies they accurately portray." *State v. Elkerson*, 304 N.C. 658, 665, 285 S.E.2d 784, 789 (1982). Here, the autopsy photographs were used to illustrate the testimony of the medical examiner. They demonstrated with clarity the nature and placement of the wounds and supported the State's theory that repeated blows to the head with a blunt weapon were the cause of Murphy's death. The crime-scene photographs were introduced during the testimony of both Deputy Parker and Agent Munson and were used to illustrate testimony "with respect to the crime scene in general" and "the location and position of the body when found." *State v. Smith*, 320 N.C. 404, 416, 358 S.E.2d 329, 336 (1987). Defendant has failed to show an abuse of discretion in the admission of these photographs. This assignment of error is overruled.

[11] By his next assignment, defendant argues the trial court erred in permitting State's witness Derrick White to testify about gestures and comments defendant made while in jail. White and defendant were in

the Harnett County jail in November 1993. White testified that on a Sunday in late November, defendant had a visitor. Although White could not see the visitor, he observed defendant pounding the fist of one hand on the palm of the other and heard him utter the word "bitch" twice while talking to the visitor. White further testified that one evening after lights were out, he heard defendant call to Woods through the air vents, saying, "I'm not going down alone. You're going down with me." Defendant contends that this testimony was unfairly prejudicial and of no probative value and that it thus should have been excluded under Rule 403.

"[M]ost evidence tends to prejudice the party against whom it is offered. However, to be excluded under Rule 403, the probative value of the evidence must not only be outweighed by the danger of unfair prejudice, it must be *substantially* outweighed." *State v. Lyons*, 340 N.C. 646, 669, 459 S.E.2d 770, 783 (1995). Here, defendant's anger toward his visitor and threats to his accomplice constituted self-incriminating actions probative of defendant's awareness of his guilt. The trial court therefore did not abuse its discretion in permitting White's testimony. This assignment of error is overruled.

[12] Defendant next contends the trial court improperly permitted the prosecutor to lead State's witness Smith through the bulk of her testimony. Specifically, defendant asserts that the prosecutor read for the jury the statement Smith made to the police and simply asked Smith to confirm certain portions.

Leading questions ordinarily should not be used to develop the direct examination of a witness. When a party calls a hostile or adverse witness, however, interrogation may be by leading questions. N.C.G.S. § 8C-1, Rule 611(c) (1992). Rulings concerning the admissibility of leading questions are in the sound discretion of the trial court and should not be disturbed absent an abuse of that discretion. *State v. Howard*, 320 N.C. 718, 722, 360 S.E.2d 790, 792 (1987).

The record discloses that Smith was a witness hostile and adverse to the party calling her, the State. She was defendant's girlfriend and had been so for five years. She did not wish to testify against him and was evasive in response to questions from the State concerning defendant's behavior on the day after the murder. The State informed the trial court that Smith was not cooperating and had refused to talk with prosecutors the day before she was to take the witness stand. Given the witness' obvious bias favoring defendant, defendant cannot demonstrate that the trial court abused its discre-

tion by allowing the prosecutor to ask leading questions. This assignment of error is accordingly overruled.

**[13]** Defendant next assigns error to the trial court's decision to sentence defendant to life imprisonment for first-degree burglary when the presumptive sentence for a class C felony is only fifteen years. Prior to sentencing, defendant requested that the trial court find nonstatutory mitigating factors regarding defendant's age at the time of the offense, his support system in the community, and his positive employment history. Defendant asserts that each factor was supported by uncontroverted testimony from his mother, father, sister, and grandmother. Because all three are now statutory mitigating factors under the Structured Sentencing Act and are therefore considered reasonably related to the purpose of sentencing, defendant contends it was error to decline to find their existence and to conclude that the factors in aggravation outweighed those in mitigation. We disagree.

Although the presumptive term for a class C felony is fifteen years, the trial court may impose a greater sentence upon consideration of aggravating and mitigating factors. N.C.G.S. § 15A-1340.4(b) (1988) (repealed effective 1 October 1994; reenacted as N.C.G.S. § 15A-1340.16 effective 1 October 1994). In contrast to statutory mitigating factors, the trial court *may* consider nonstatutory factors but is not required to do so. *State v. Cameron*, 314 N.C. 516, 518-19, 335 S.E.2d 9, 10 (1985). "[C]onsideration of a non-statutory factor which is (1) requested by the defendant, (2) proven by uncontradicted, substantial and manifestly credible evidence, and (3) mitigating in effect, is a matter entrusted to the sound discretion" of the trial court. *State v. Spears*, 314 N.C. 319, 322, 333 S.E.2d 242, 244 (1985). Failure to find such a nonstatutory mitigating factor will not be disturbed on appeal absent a showing of abuse of that discretion. *Id.* at 322-23, 333 S.E.2d at 244. Here, the evidence in support of defendant's proposed nonstatutory mitigating factors all came from interested witnesses and substantially supported the statutory mitigator that defendant was a person of good character or had a good reputation in the community in which he lived, which the trial court did find. Further, defendant was sentenced under the Fair Sentencing Act; thus, the Structured Sentencing Act, including its statutory mitigating factors, has no relevance. The trial court therefore did not abuse its discretion in rejecting defendant's proposed nonstatutory mitigating factors or in sentencing defendant to life imprisonment for the first-degree burglary conviction.

**[14]** By his next assignment of error, defendant argues that the trial court erred in allowing Detective Lamm to testify about Smith's demeanor during interviews with law enforcement officers. On redirect examination Detective Lamm described Smith as being uncooperative and reluctant to answer questions the first time he spoke with her and as "more open" during their second conversation. Defendant contends that Detective Lamm's opinions about Smith's demeanor do not meet the evidentiary test for admissibility of lay-witness opinions and that his motion to strike should therefore have been allowed.

Rule 701 permits a lay witness to testify as to opinions or inferences which are "(a) rationally based on the perceptions of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C.G.S. § 8C-1, Rule 701 (1992). Here, Detective Lamm's opinion about Smith's demeanor was based on his personal observations over the course of two meetings and was helpful to a clear understanding of his testimony concerning the differences between Smith's statements. As such, the trial court properly allowed him to offer it.

**[15]** Defendant next argues that the trial court erred in admitting a tape recording and the transcript of the 911 call Woods made to the Sanford Police Department. Defendant contends these materials were inadmissible hearsay not subject to any of the hearsay exceptions.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. N.C.G.S. § 8C-1, Rule 801(c) (1992). If a statement is offered for any other purpose, it is not hearsay and is admissible. *State v. Reid*, 335 N.C. 647, 661, 440 S.E.2d 776, 784 (1994). Here, the tape and transcript were not offered to prove the truth of the matter asserted therein, that is, that Woods had an accomplice; rather, their significance lies solely in the fact that the 911 call was made. The dispatcher verified the tape recording as being a true and accurate reproduction of the 911 call he received from Woods. Woods testified that he made the call and that it was his voice on the tape. The tape and transcript were simply further proof to the jury that the call was made and that Woods was the caller. The hearsay rule is therefore inapposite. This assignment of error is overruled.

**[16]** By his final assignment or error, defendant argues that the trial court improperly excluded evidence of Woods' prior violent conduct.

In opening remarks to the jury and during his case-in-chief, defendant attempted to put before the jury that Woods almost got into two or three fights the night of the murder, that he was reading a book about satanic worship and bizarre murders, that he had once stabbed a friend in the chest, and that he had assaulted a man by trying to hit him in the back of the head with a horseshoe spike. The trial court sustained the State's objection to defense counsel's forecast of this evidence and after *voir dire*, granted the State's motion *in limine* to exclude any further evidence of Woods' prior violent conduct. The trial court based its ruling on Rule 608(b), which bars introduction of evidence of specific instances of conduct to attack or support the credibility of a witness, with the limited exception of evidence clearly probative of truthfulness or untruthfulness.

This Court addressed a factually similar situation in *State v. Strickland*, 321 N.C. 31, 361 S.E.2d 882 (1987). The defendant there attempted to introduce evidence of prior assaults purportedly committed by a witness who was with the defendant at the time of the murder. We held that " 'extrinsic instances of assaultive behavior, standing alone, are not in any way probative of the witness' character for truthfulness or untruthfulness,' and therefore are inadmissible under Rule 608(b)." *Id.* at 39, 361 S.E.2d at 886-87 (quoting *State v. Morgan*, 315 N.C. 626, 635, 340 S.E.2d 84, 90 (1986)).

Defendant attempts to bolster his argument by contending that he did not offer this evidence to attack Woods' credibility but to show that it was Woods who actually inflicted the fatal blows. He argues that Rule 404(b) allows evidence of other crimes, wrongs, or acts to prove *modus operandi*, identity, and intent; Woods' *modus operandi* was to drink alcohol or use drugs and then engage in assaultive behavior. Because the identity of the actual murderer is at issue, defendant contends, Woods' pattern of assaultive conduct is relevant and admissible.

Rule 404(b) permits the use of extrinsic conduct evidence so long as the evidence is relevant for some purpose other than to show that the witness acted in conformity with the prior misconduct. If the evidence is introduced to show the same mode of operation, the conduct must be sufficiently similar to support a reasonable inference that the same person committed both the earlier and the later acts. *State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991). "Under Rule 404(b) a prior act or crime is 'similar' if there are 'some unusual facts present in both crimes or particularly similar acts which would indi-

cate that the same person committed both.' " *Id.* at 304, 406 S.E.2d at 890-91 (quoting *State v. Green,* 321 N.C. 594, 603, 365 S.E.2d 587, 593, *cert. denied,* 488 U.S. 900, 102 L. Ed. 2d 235 (1988)).

Woods testified on *voir dire* that he had stabbed James Warwick in 1990 after Warwick had provoked him, that he threatened to hit a man with a horseshoe rod after the man first threatened to pull out a gun, that he and defendant had been in a fistfight, and that he had read one paragraph from an encyclopedia of satanic worship but that it was not his book. The State's evidence tends to show that Woods and defendant broke into Murphy's trailer; that upon being discovered, Woods dragged Murphy back to her bedroom; and that defendant went into the bedroom and beat Murphy to death with a hammer. We fail to see any commonality between the proffered evidence of Woods' prior misconduct and the events surrounding the Murphy murder.

**[17]** We likewise reject defendant's argument that he offered the evidence as proof of the identity of Murphy's assailant.

> "[W]here the evidence is proffered to show that someone other than the defendant committed the crime charged, admission of the evidence must do more than create mere conjecture of another's guilt in order to be relevant. Such evidence must (1) point directly to the guilt of some specific person, and (2) be inconsistent with the defendant's guilt."

*State v. Burr,* 341 N.C. 263, 293, 461 S.E.2d 602, 618 (1995) (quoting *State v. McNeill,* 326 N.C. 712, 721, 392 S.E.2d 78, 83 (1990)), *cert. denied,* — U.S. —, 134 L. Ed. 2d 526 (1996). Defendant's proffered evidence fails this test. The alleged misconduct indicates only that Woods had in the past displayed aggression toward other men upon being provoked, not that he mercilessly beat to death an eighty-nine-year-old woman. Likewise, the evidence in no way exculpates defendant or provides any inconsistency with his guilt. Indeed, it appears that defendant attempted to introduce the evidence to show conformity with past violent acts, the only purpose specifically prohibited by Rule 404(b).

**[18]** Defendant concludes by contending that the State thrice "opened the door" to the admissibility of evidence about Woods' prior violent conduct. Defendant asserts first that the testimony of Patricia Benson opened the door to rebuttal evidence concerning Woods' conduct. On cross-examination Benson testified that "because he had no

STATE v. DICKENS

[346 N.C. 26 (1997)]

reason to lie to me," she believed Woods when he told her defendant killed Murphy. We fail to see how this statement raises the issue of Woods' prior violent conduct or reflects in any way upon the likelihood that Woods, not defendant, committed the Murphy murder.

Defendant next argues that the State "opened the door" during its direct examination of Woods himself. Woods read aloud to the jury a letter he had written to Murphy's grandson, which stated in part:

> I'm sorry, very sorry that what happened, happened. I never would have let it happen if only I knew. Tell you the truth, I wish he would have killed me too, because it made no sense. I know I was a friend. I let you down. But, believe me, I could not have done it. Before I knew what was happening, it happened.

Defendant contends he was forced to rebut the assertion that Woods "could not have done it" with evidence of Woods' capability and propensity to injure others. Again, in context, it is evident that Woods was not referring to a physical inability to kill Murphy but rather to emotional ties to Murphy and her family that would have psychologically prohibited him from committing such an inhumane act.

Finally, defendant asserts that the State opened the door by asking Woods if he had ever been convicted of any crimes. Convictions and undocumented random acts of violence are subject to distinct evidentiary rules. As a general matter, evidence of convictions for crimes punishable by more than sixty days' confinement may be admitted to impeach a witness. N.C.G.S. § 8C-1, Rule 609(a) (1992). However, as noted, evidence of prior acts may not be admitted except under limited circumstances we have already deemed inapplicable here. Because defendant sought to introduce instances of conduct rather than convictions, he may not avail himself of the benefits of Rule 609(a). Accordingly, the trial court properly excluded the evidence concerning Woods' prior violent conduct, and this assignment of error is overruled.

We conclude that defendant received a fair trial, free from prejudicial error.

NO ERROR.